May 19, 2026

**Supreme Court**

No. 2024-104-C.A.
(P1/22-3059BG)

(Concurrence and dissent begins on Page 30)
(Dissent begins on Page 33)

|  |  |
|---|---|
| State | : |
| v. | : |
| Isaiah Pinkerton. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Isaiah Pinkerton. | : |

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  The defendant, Isaiah Pinkerton (defendant or Pinkerton), appeals from a judgment of conviction and commitment following a jury trial held in the Providence County Superior Court.  A grand jury issued an indictment, charging Pinkerton with seventeen counts relating to both a murder that occurred on August 1, 2021, and certain evidence, *viz.*, a firearm, obtained as a result of a traffic stop that occurred on December 12, 2021.  On appeal, the defendant contends that the trial justice erred in denying his motion to suppress cell phone records obtained through a search warrant and his motion to suppress evidence from a particular DNA buccal swab obtained through his consent.

- 1 -

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**Facts and Travel**

On August 1, 2021, Miya Brophy-Baermann was enjoying the early morning hours with her boyfriend, Sheron Robinson, and other friends. Around 2:30 a.m., the couple returned to Robinson's apartment; and shortly thereafter, Robinson escorted Brophy-Baermann to her vehicle, which was parked on Olney Street in Providence. The duo stood at Brophy-Baermann's vehicle, chatting for approximately fifteen minutes. At trial, Robinson recounted the fateful moments. A dark sedan approached them at a high rate of speed. Robinson heard the engine revving and witnessed the vehicle straddling the middle line of the street, "almost as if * * * they wanted to get closer to our position." Suddenly, four gunshots rang out in rapid succession, along with a flash of light emanating from the speeding vehicle. Understanding the gravity of the situation, Robinson examined himself and confirmed that he had not been shot. Robinson then assessed Brophy-Baermann and discovered that she was in obvious distress; her last words were, "I'm shot."

Emergency personnel soon arrived and transported Brophy-Baermann to Rhode Island Hospital. Rather than celebrating the start of her fourth week as a clinical fellow at Lincolnwood Rehabilitation Center in North Providence,

Brophy-Baermann was pronounced dead. Tragically, she was twenty-four years old. Two nine-millimeter cartridge casings were recovered from the scene.

For months, Brophy-Baermann's murder remained unsolved, but then, in the early morning hours of December 12, 2021, a fortuitous traffic stop shined a spotlight on a suspect, defendant. Patrolman Ryan Malloy and Patrolman Brad McParlin were patrolling the area of Broad Street in Providence. The police were on heightened alert due to a murder that had occurred hours earlier. While on patrol, they noticed a vehicle with heavily tinted windows. The vehicle then made erratic and suspicious movements, which the officers considered indicative of a driver seeking to avoid the police. Upon following the vehicle, the officers observed it make additional evasive maneuvers, including rapid acceleration, while also committing what they considered to be traffic violations. When the vehicle accelerated, the officers briefly lost sight of it, but shortly thereafter they managed to pull the vehicle over.

As the officers approached the vehicle, Officer Malloy recognized its three occupants, Justin Laurie (the driver), Shawn Mann (the front-seat passenger), and defendant (the rear-seat passenger). All three were known associates of James "Hammer Beanz" Owens, the decedent who was murdered hours earlier. The officers also observed that, even though it was December and had been raining, the rear passenger window closest to where defendant had been sitting (on the left side

- 3 -

behind the driver) was completely lowered. Officer Malloy further detected that defendant was manifesting nervous behavior, including heavy breathing and the avoidance of eye contact.

The officers canvassed the route that the vehicle had previously traversed, looking for possible discarded items. As they backtracked, Officer Malloy discovered and seized a cross-body satchel. Based on the path the vehicle had traveled, the satchel was located on the left side of the road; and in spite of the fact that it had been heavily raining, the satchel was fairly dry and free of any debris. Upon seizing the bag, Officer Malloy immediately realized, based upon its weight and the shape of the object inside the satchel, that it contained a firearm. He unzipped the satchel and shined his flashlight inside to observe its contents; he confirmed the bag contained a firearm. Thereafter, defendant, Laurie, and Shawn Mann were all handcuffed and transported to the Providence Police Department.

Shortly after 2 a.m. on December 12, 2021, Detective Theodore Michael and Detective Kevin Costa, both of the Providence Police Department, interviewed Pinkerton. The defendant was apprised of his *Miranda* rights, and it is uncontroverted that he freely and voluntarily waived those rights and agreed to talk to the detectives. The conversation mostly concerned the murder of defendant's associate, Owens, which had occurred hours earlier, but intermittently Det. Michael also questioned Pinkerton concerning the firearm that was discovered in the

abandoned satchel. Pinkerton denied any knowledge of the firearm and agreed to a buccal swab for possible DNA comparison.[1] We discuss the interview and the buccal swab in greater detail, *infra*. After less than an hour with the detectives, Pinkerton was released but the investigation into Brophy-Baermann's murder continued and was reenergized.

A forensic analysis linked the casings discovered after the shooting on Olney Street to the firearm discovered in the satchel. Additional forensic analysis revealed that the handgun contained DNA from at least two people and that the "major component DNA profile" belonged to Pinkerton. A statistical comparison further determined that the DNA profile generated would be expected to be found "in one in greater than 12 nanillion," which equates to thirty zeros.

Police also received information from Silkies Paulino, another associate of defendant and whose boyfriend, Dante Mann, was shot and killed in October 2020.[2] Paulino related that, on August 1, 2021, she spoke with defendant and he conveyed that he and Shawn Mann had been driving around looking to avenge Dante Mann's

---

[1] "A buccal swab is a long handled sterile cotton swab that is rubbed against the inside of a person's cheek to collect cell samples." *State v. Roscoe*, 198 A.3d 1232, 1236 n.3 (R.I. 2019).

[2] Dante Mann and Shawn Mann were brothers. In October 2024, Shawn Mann was convicted of, *inter alia*, the first-degree murder of Brophy-Baermann. His appeal is pending before this Court.

death. Paulino further relayed that defendant indicated that he and Shawn Mann had found a rival target, whom they shot.

The next day, Paulino and defendant spoke once again; specifically, Paulino asked defendant whether he had shot "the girl on the news." According to Paulino, defendant admitted he had done so, but claimed that it was an "accident," and that he "f* * *ed up." Several days later, on August 5, 2021, Paulino texted Pinkerton a picture of Brophy-Baermann, along with a notice that a reward would be paid for information leading to the arrest and conviction of the person responsible for Brophy-Baermann's murder. According to Paulino, Pinkerton responded that he was unconcerned with the reward due to what he considered as the relatively low amount. Soon thereafter, on August 8, 2021, Paulino participated in a three-way telephone call, during which defendant, again, acknowledged shooting Brophy-Baermann.

The record further reveals that at 4:57 a.m., on December 12, 2021, defendant texted Paulino, advising that he had just been released from jail. According to Paulino, the two soon talked on the telephone, during which conversation defendant described the events preceding his arrest—a police pursuit in a vehicle with Shawn Mann and Laurie. Paulino further recounted Pinkerton's account: during the pursuit, Laurie accelerated and made a quick turn, at which point defendant tossed the gun out the window. After the reward increased to $100,000, and fearing for her own

safety, Paulino provided police with information incriminating defendant in Brophy-Baermann's murder. Police also obtained a search warrant for Paulino's cell phone, seizing the communications discussed *supra*, as well as other evidence implicating defendant in Brophy-Baermann's murder.

On August 24, 2022, a grand jury indicted defendant on seventeen counts: one count of murder; six counts of conspiracy; two counts of discharging a firearm while committing a crime of violence; one count of discharging a firearm from a motor vehicle, thereby creating a substantial risk of death or serious personal injury; two counts of unlawfully possessing a ghost gun; two counts of carrying a firearm without a license; two counts of possession of a firearm after a conviction of a crime of domestic violence; and one count of assault with intent to commit murder.

In May 2023, defendant filed several pretrial motions, including the two motions that are before us on appeal: (1) defendant's "Motion to Suppress Mobile/Cellular Records for (401) 771-7836, Seized Pursuant to the January 14, 2022 Warrant" and (2) defendant's "Motion to Suppress the Buccal Swab Obtained Without Mr. Pinkerton's Free and Voluntary Consent." After an evidentiary hearing on the latter motion, the trial justice issued a written decision denying the motions to suppress on June 14, 2023.

On or about June 19, 2023, a jury trial commenced. At the close of the evidence, defense counsel moved for a judgment of acquittal pursuant to Rule 29 of

the Superior Court Rules of Criminal Procedure. After hearing arguments, the trial justice dismissed all but one of the six conspiracy counts, *viz.*, count 2, alleging conspiracy to commit murder. The defendant was found guilty of the remaining counts. On January 26, 2024, the trial justice pronounced the sentence; defendant received two consecutive life sentences as well as additional consecutive terms totaling fifty years to serve, ten of which were non-parolable. A judgment of conviction and commitment was entered, and defendant filed a notice of appeal.

## A

### The Defendant's Motion to Suppress Cell Phone Records

On January 14, 2022, Det. Michael submitted a complaint, affidavit, and a search warrant relating to, *inter alia*, the cell phone records pertaining to (401) 771-7836, a number that had been used by defendant. The affidavit begins with Det. Michael describing his nineteen years of experience with the Providence Police Department, his assignment within the investigative division/major crimes bureau, and his participation in various law enforcement organizations. Detective Michael also specified his training and experience in investigations relating to cellular/mobile forensics and cellular triangulations.

Detective Michael's affidavit detailed certain facts implicating defendant in Brophy-Baermann's murder. In particular, the affidavit stated that nine-millimeter shell casings were located at the crime scene. The affidavit also described the

December 12, 2021 traffic stop, and specifically, the discovery of the satchel containing the nine-millimeter ghost gun. Detective Michael further related that a forensic analysis connected the firearm to the shell casings and that DNA recovered from the firearm was consistent "with the reference profile from Isaiah Pinkerton * * *."

In his affidavit, Det. Michael also stated that, as a result of the December 12, 2021 traffic stop, defendant, Laurie, and Shawn Mann were detained and transported to the Providence police station, and that all three detainees provided the police with cell phone numbers. The defendant provided two cell phone numbers, neither of which pertained to cell phone number (401) 771-7836. Detective Michael noted that he compared the cell phone numbers that he received to "Tower Dumps" in order "to see if any of the subjects were in the area of the homicide on August 1, 2021 * * *." The comparison revealed that a number provided by Shawn Mann "appeared in the Tower Dump Data for T-Mobile."

Critically, the affidavit continued and stated:

> "Through the investigation it was learned that Isaiah Pinkerton also utilized the mobile number of 401-771-7836 through the T-Mobile USA Network that was NOT known by the Providence Police initally [*sic*]."

In this regard, Det. Michael referenced his experience and training in mobile forensics and expressed that mobile devices contain data evidencing communications among multiple parties, as well as "location data that can assist the

Providence Police in locating a mobile device[] in [a] particular area, and a particular time." Based upon these circumstances, Det. Michael requested "the Historical Call Detail Records for the mobile number of Isiah [sic] Pinkerton in 401-771-7836 * * * from July 1, 2021, to December 18, 2021 for any/all evidence of admission/evidence of the crime in this investigation." A District Court judge signed the warrant, and T-Mobile USA Network subsequently provided the cell phone records from July 1, 2021, through December 1, 2021.

As previously noted, defendant filed a motion to suppress the cell phone records associated with the cell phone number (401) 771-7836. Specifically, defendant contended that the affidavit alleged no facts connecting him to the (401) 771-7836 number, and he further alleged that the affidavit failed to connect that number to the homicide. In addition, defendant asserted that the affidavit lacked information regarding the investigation that led to the discovery of the (401) 771-7836 number, and he stated that there were "no facts that even allowed for an inference that the phone number was connected to [defendant], or that it was 'utilized' during the relevant time period of July-August 2021." The defendant further emphasized that the affidavit only contained the following conclusory language: "Through the investigation it was learned that Isaiah Pinkerton also utilized the mobile number of 401-771-7836 through the T-Mobile USA Network that was NOT known by the Providence Police initally [sic]."

- 10 -

The state filed an objection to the motion, in which it contended that defendant's claims failed because "the affidavit does in fact contain sufficient reliable information to establish probable cause." The state highlighted that the affidavit described: the commission of the crime; the weapon used to commit the crime; and defendant's connection to that weapon through DNA and ballistics testing. The state additionally pointed to information in the affidavit regarding defendant's use of cell phones—including the fact that defendant provided only two cell phone numbers to the affiant during the December 12, 2021 interview—and that his "co-conspirator used a cellular telephone identified as being in the vicinity of the homicide through cellular tower dump analysis." Additionally, the state argued that the affiant described "the widespread use of cellular telephones and the types of relevant data available from the cellular service provider, including location data, which is evidence of where a particular mobile device was located during a specific time frame."

A hearing on the motion to suppress took place on May 30, 2023. At that hearing, the parties provided arguments that were substantially similar to those provided in their filings. The trial justice denied defendant's motion to suppress.

## B

## The Defendant's Motion to Suppress the Buccal Swab

The defendant filed a motion to suppress the evidence obtained from the buccal swab, which he asserted was gained without his free and voluntary consent. In the motion to suppress, defendant contended that, while being detained at the Providence police station after the December 12, 2021 traffic stop, "the police conducted a warrantless search of [defendant's] person, obtaining a buccal swab for his DNA." He further noted that, while he did sign a consent form relative to that search, "the totality of the circumstances demonstrates that the search was conducted without [defendant's] free and voluntary consent." The state filed an objection to defendant's motion to suppress.

During the hearing on the motion to suppress, the state presented the testimony of Officer Malloy and Det. Michael. The defendant elected not to testify at the suppression hearing. Upon the conclusion of Det. Michael's testimony, the parties presented arguments relative to the motion to suppress. The trial justice denied defendant's motion to suppress.

Additional relevant facts will be discussed as necessary.

## Issues on Appeal

The defendant contends that the trial justice erred in denying his motion to suppress the cell phone records associated with (401) 771-7836 because there was

neither "probable cause to believe evidence of the murder would be found in those records" nor was there anything connecting defendant to that cell phone number. The defendant also argues that the trial justice erred in denying the motion to suppress the buccal swab evidence because he did not freely and voluntarily consent.

**Standard of Review**

This Court has previously stated that "when reviewing a trial justice's decision granting or denying a motion to suppress, we defer to the factual findings of the trial justice, applying a clearly erroneous standard." *State v. Depina*, 245 A.3d 1222, 1226 (R.I. 2021) (brackets omitted) (quoting *State v. Storey*, 8 A.3d 454, 459-60 (R.I. 2010)). When reviewing "the denial of a motion to suppress, 'we are required to make an independent examination of the record to determine if the defendant's rights have been violated.'" *State v. Cooper*, 340 A.3d 432, 439 (R.I. 2025) (quoting *State v. Casas*, 900 A.2d 1120, 1129 (R.I. 2006)). Accordingly, "we will reverse a trial justice's findings on a motion to suppress only if '(1) his or her findings * * * reveal clear error, and (2) our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were denied.'" *State v. Gonzalez*, 136 A.3d 1131, 1145 (R.I. 2016) (quoting *State v. Grayhurst*, 852 A.2d 491, 513 (R.I. 2004)).

## Analysis

## A

## The Motion to Suppress Cell Phone Records

On appeal, defendant contends that the affidavit in support of the search warrant did not allege specific facts connecting him with the cell phone number or the cell phone number to the murder; he adds that the affidavit only contained the "unsupported assertion that police learned through the investigation" that defendant had used that number. (Internal quotation marks omitted.) He also posits that the "bare conclusion that it was learned that [defendant] used this number, unsupported by any facts, did not establish probable cause." Additionally, defendant argues that there were no other facts or allegations connecting the cell phone number to the homicide of Brophy-Baermann.

For its part, the state asserts that the trial justice correctly determined that the affidavit established probable cause that the cell phone records contained evidence of criminal activity. To support that contention, the state emphasizes the eight-page affidavit detailing: Det. Michael's experience and background; the circumstances of the murder; the police investigation; defendant's connection to the investigation; and

- 14 -

why there was a belief that the cell phone records would contain evidence of the crime.[3]

As we have previously made clear, "[t]he Fourth Amendment to the United States Constitution and article 1, section 6, of the Rhode Island Constitution, prohibit the issuance of a search warrant absent a showing of probable cause." *State v. Verrecchia*, 880 A.2d 89, 94 (R.I. 2005). The judicial officer must ascertain probable cause "within the four corners of the affidavit prepared in support of the warrant * * *." *State v. Byrne*, 972 A.2d 633, 638 (R.I. 2009). We have stated that the existence of probable cause should be determined "pursuant to a flexible 'totality-of-the-circumstances analysis.'" *Verrecchia*, 880 A.2d at 94 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). And we have also recognized that the "approach to the probable cause question should be pragmatic and flexible" with the judicial officer "permitted to draw reasonable inferences from the affidavit presented to him or her." *Id.*; *see Byrne*, 972 A.2d at 638 ("In making this determination, the issuing magistrate must review the affidavit and, based on the facts contained therein, together with the reasonable inferences that may be drawn from those facts,

---

[3] The state also argued that, if this Court were to conclude that the affidavit lacked probable cause, the evidence obtained pursuant to the search warrant would still be admissible pursuant to the good-faith exception to the exclusionary rule. *See generally United States v. Leon*, 468 U.S. 897 (1984). The state further posited that any error would be harmless. In light of our resolution of this issue, we need not address these arguments.

make a practical, commonsense determination as to 'whether there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting *Gates*, 462 U.S. at 238).

This Court has also observed that "[b]ecause there is 'a strong preference for searches conducted pursuant to a warrant,' affidavits are to be interpreted in a realistic fashion that is consistent with common sense, and not subject to rigorous and hypertechnical scrutiny." *Byrne*, 972 A.2d at 638 (quoting *Gates*, 462 U.S. at 236). Furthermore, it is "incumbent upon the trial justice and the reviewing court to accord great deference to the issuing magistrate's probable-cause determination, so long as there is a showing of 'a substantial basis from which to discern probable cause.'" *Id.* (quoting *State v. Correia*, 707 A.2d 1245, 1249 (R.I. 1998)). We have indicated that "'[t]he magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit,' and 'in doubtful cases, the reviewing court should give preference to the validity of the warrant.'" *Id.* at 639 (brackets omitted) (quoting *United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir. 1985)). "[A] reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). We review a trial justice's determination

- 16 -

of the existence or nonexistence of probable cause *de novo*. *See Verrecchia*, 880 A.2d at 95.

It is undisputed that the only place the affidavit directly points to any specific connection between defendant and the cell phone number (401) 771-7836 is in the following statement: "Through the investigation it was learned that Isaiah Pinkerton also utilized the mobile number of 401-771-7836 through the T-Mobile USA Network that was NOT known by the Providence Police initally [*sic*]." However, defendant's attention to this single sentence is misplaced because "[p]robable cause must be ascertained * * * based on the totality of the circumstances presented in the affidavit." *Byrne*, 972 A.2d at 638. The trial justice properly reviewed the affidavit with this holistic approach.

In denying defendant's motion to suppress, the trial justice specifically noted Det. Michael's professional experience, which was not disputed by defendant. Detective Michael's affidavit began with a recitation of his training and experience in the fields of forensic cell phone and cell phone location data examination. Detective Michael further elucidated that most of the population of the United States communicates through cell phones, and, for that reason, cell phone records contain particularly useful communications and location data for law enforcement investigations. The trial justice further explained that defendant's arguments "fail[] to account for scores of undisclosed and clandestine cell phone and social media

- 17 -

correspondence which Detective Michael, in his experience, attests probably relates to criminal activity, given the entirety of the circumstances in this case."

We note that, among other details, Det. Michael's affidavit described the murder and the ensuing investigation, implicating defendant in Brophy-Baermann's murder. Critically, the affidavit detailed defendant's involvement in the December 12, 2021 traffic stop and the discovery of the satchel containing the nine-millimeter ghost gun. The affidavit further linked the shell casings found at the crime scene to the firearm seized as a result of the traffic stop, and the affidavit detailed that defendant's DNA was found on the gun. The trial justice also emphasized Det. Michael's statement that he discovered, through the investigation, that defendant had utilized the (401) 771-7836 cell phone number and that this cell phone number had not been disclosed to the detectives when defendant was interviewed on December 12, 2021.

To be sure, defendant focuses upon this single sentence—rather than the totality of the detailed eight-page affidavit—in maintaining that "[t]here was no explanation of what the police investigation entailed and how it led them to this conclusion." In *Gates*, the Supreme Court of the United States considered a similar argument when it agreed that an informant's "veracity," "reliability," and "basis of knowledge" were all "highly relevant" in determining whether a search warrant satisfied the probable cause standard. *See Gates*, 462 U.S. at 230. Despite the

- 18 -

relevancy of these multiple considerations, the Supreme Court explicated that these elements should not be "understood as entirely separate and independent requirements to be rigidly exacted in every case * * *." *Id.* Rather, these considerations are better understood "in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233.

While, unlike *Gates*, this appeal does not concern the reliability of an informant, it is our opinion that when viewed in its totality, the affidavit specifically implicates defendant in Brophy-Baermann's murder and that the trial justice did not err when he concluded that the District Court judge drew reasonable inferences from the affidavit and determined that there was sufficient probable cause to obtain the cell phone records associated with (401) 771-7836. As this Court has previously stated, "a nexus between the items to be seized and the place to be searched does not rise or fall on direct observations, or, * * * on the existence of underlying facts connecting the two." *Byrne*, 972 A.2d at 642 (internal quotation marks omitted).

In the case at bar, defendant has effectively excised the statement relating to (401) 771-7836 from the entire affidavit. However, the affidavit in its entirety sufficiently indicates that probable cause existed. *See, e.g.*, *State v. Hudgen*, 272 A.3d 1069, 1082 (R.I. 2022) ("[T]he question for this Court is not whether the fifth

- 19 -

paragraph of the affidavit provides a substantial basis to find the two .22-caliber guns in defendant's apartment. Rather, the question is whether the affidavit as a whole provides a substantial basis for concluding that the apartment likely [contains evidence of the crime].").  Therefore, when read in the context of the entirety of the lengthy affidavit, which the totality-of-the-circumstances approach counsels us to do, we are satisfied that probable cause existed as to the likelihood that defendant committed the shooting on August 1, 2021, and that evidence relevant to that crime would be found in the cell phone records pertaining to (401) 771-7836. *See Byrne*, 972 A.2d at 640 ("[I]t is our view that a reasonable inference could be drawn from these facts that the camera—the instrumentality of the crime and a handheld, easily transportable item of personal property—could be found at defendant's residence."); *see also State v. Cosme*, 57 A.3d 295, 302 (R.I. 2012).

**B**

**The Motion to Suppress the Buccal Swab**

The defendant argues on appeal that he did not freely consent to the buccal swab and that the detectives led him "to believe he had no choice but to submit to a DNA swab."  Specifically, defendant directs our attention to Det. Michael's statements: "[Y]ou're gonna take a buccal, right?" and "I'm gonna have you sign for a buccal * * *."  Pinkerton further references his inquiry, "So we all gotta do this?" and Det. Michael's response, "Yeah. The other guys are gonna do it too."  Based

- 20 -

upon these expressions, defendant claims that his consent to the buccal swab was the result of "false claims of authority" and that the trial justice erred when he "overlooked the detective's statements of authority * * *."

The defendant presents additional arguments concerning the voluntariness *vel non* of the buccal swab. For example, defendant asserts that the trial justice failed to properly consider that he was in custody during the interview or that Det. Michael purportedly used "that custody as leverage." The defendant notes that after being arrested, he was handcuffed to the wall at 2 a.m. and that he was therefore more susceptible to pressure applied by the police. He also states that Det. Michael "pushed him into compliance by suggesting that he would be released if he succumbed[.]" Finally, defendant contends that the trial justice erred in focusing on the consent form that defendant signed because it "was not sufficient to establish free and voluntary consent." The state disputes the merits of defendant's arguments.

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is '*per se* unreasonable subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (deletion omitted) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). This Court has made clear that consent is one of the explicitly established exceptions to the requirement of a warrant. *See Gonzalez*, 136 A.3d at 1147; *see also Schneckloth*, 412 U.S. at 219.

- 21 -

However, the state must prove that consent was "freely and voluntarily given" to justify a search or seizure on consent grounds. *See Gonzalez*, 136 A.3d at 1147 (quoting *State v. Bailey*, 417 A.2d 915, 918 (R.I. 1980)); *see also id.* ("In the Fourth Amendment context, the state must prove by a 'fair preponderance of the evidence' that there was free and voluntary consent.") (quoting *State v. O'Dell*, 576 A.2d 425, 427 (R.I. 1990)).

While "we give deference to the findings of historical fact made by a trial justice," this Court reviews "the determination of the voluntariness of an individual's consent to search * * * *de novo.*" *State v. Shelton*, 990 A.2d 191, 199 (R.I. 2010) (quoting *State v. Texter*, 923 A.2d 568, 576-77 (R.I. 2007)). There is no single criterion that is determinative "in deciding whether or not there was free and voluntary consent." *See Gonzalez*, 136 A.3d at 1148. Rather, "the question of whether consent was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 1147-48 (quoting *Palmigiano v. Mullen*, 119 R.I. 363, 370, 377 A.2d 242, 246 (1977)). We look to whether, under the totality of the circumstances, defendant's will was overborne. *See State v. Mlyniec*, 15 A.3d 983, 996 (R.I. 2011). Some of the factors that may be considered include the youth of the accused, the lack of education, low intelligence, the absence of notice to the accused of his or her constitutional rights, the length of detention, the repeated and

prolonged nature of questioning, and the use of physical punishment. *See Schneckloth*, 412 U.S. at 226.

After carefully scrutinizing defendant's arguments, it is our opinion that the trial justice did not err when he denied defendant's motion to suppress the evidence obtained as a result of the buccal swab. In *State v. Humphrey*, 715 A.2d 1265 (R.I. 1998), this Court recognized that the defendant's confession that he had attempted to murder two state troopers was not rendered involuntary based upon his hours-long confinement in a conference room during which he was stripped to an undershirt and underwear; his legs were shackled; and he was handcuffed to a wall, parallel to his shoulder, while seated. *See Humphrey*, 715 A.2d at 1269, 1274-75; *see also State v. Robinson*, 989 A.2d 965, 976 (R.I. 2010). So too here.

In denying defendant's motion to suppress, the trial justice articulated compelling findings of fact. The trial justice noted that "Pinkerton agrees that he was properly advised of his *Miranda* rights, understood them, and voluntarily spoke with the detectives." (Italics added.) He further recognized that "Pinkerton [was] not a newcomer to the criminal justice system," and, as an example, he noted that Pinkerton had been "cooperating with the Rhode Island State Police in a criminal investigation." Additionally, the trial justice observed that "Pinkerton enjoyed a very comfortable relationship with Detective Michael" and that defendant "did not blindly, hastily, or cavalierly sign the consent form." Rather, as the trial justice

noted, even though Det. Michael acknowledged that he had not orally advised defendant that he could decline the buccal swab,[4] "[i]t is clear from the video that Pinkerton read [the consent form], considered it, and insisted on knowing what it was for." The trial justice added that the plain language on the consent form "makes it abundantly clear to any casual reader that the swabbing could be conditioned upon a warrant and that declining to consent was an obvious option."

The trial justice further determined that there was no suggestion that defendant was under the influence of alcohol or drugs; that Det. Michael had advised defendant that he was not under arrest and that he expected defendant to be released at the conclusion of their conversation; that defendant was handcuffed to the wall bar for officer safety; that there was an absence of evidence that defendant's will was overborne "by threats or inappropriate promises to obtain his consent"; and that "[t]he facts do not support chicanery." In determining whether defendant's consent was voluntarily procured, these findings of fact are entitled to our deference, and we discern no error in these determinations. *See Shelton*, 990 A.2d at 199.

The defendant spent less than one hour in the conference room being interviewed and the questioning largely focused on the murder of defendant's

---

[4] *See Schneckloth v. Bustamonte*, 412 U.S. 218, 232-33 (1973) ("[W]e cannot accept the position of the Court of Appeals in this case that proof of knowledge of the right to refuse consent is a necessary prerequisite to demonstrating a 'voluntary' consent.") (internal quotation marks omitted).

- 24 -

associate, which had been committed hours earlier. As the trial justice observed, Pinkerton's left hand was handcuffed to the wall bar for officer safety, but he was not shackled, he was provided a cup of water, and he was well acquainted with Det. Michael and the criminal justice system. Our review of the video footage depicts a conversational and non-confrontational dialogue, during which defendant was seated at a table, appeared comfortable, and did not express a hint of duress or that his will was overborne. It is further notable that upon entering the conference room, defendant was apprised of his *Miranda* rights and signed the waiver form. Indeed, during the hearing on the motion to suppress, defense counsel candidly acknowledged that defendant understood his *Miranda* rights and voluntarily waived them.

Our review of the totality of the record further establishes that on multiple occasions defendant expressly and voluntarily consented to the buccal swab. In one instance, the following colloquy ensued:

> "[DETECTIVE MICHAEL]: Good. Good. You wanna take a bu- -- you're gonna take a buccal, right?
>
> "[DEFENDANT]: Huh?
>
> "[DETECTIVE MICHAEL]: I'm gonna have you sign for a buccal swab so they can make sure that it wasn't -- I gotta do --
>
> "[DEFENDANT]: What's that?

"[DETECTIVE MICHAEL]: To make sure there's no DNA on that gun. There's been --

"[DEFENDANT]: *Oh, you can do -- all right. All right, f\* \* \*ing, yeah. \* \* \**

"[DETECTIVE MICHAEL]: Right there. I'll fill everything out.

"[DEFENDANT]: 'Cause you know, I don't wanna -- I wanna make sure --

"[DETECTIVE MICHAEL]: I -- I wanna make sure that you, you know, you're -- you're --."[5] (Emphasis added.)

The defendant's affirmative retort—and his equally compelling body language as seen in the video—demonstrate an unequivocal and unconditional expression of voluntary consent. This was the first instance evidencing voluntary consent.

As defendant was reviewing the form, Det. Costa began questioning him relative to Owens's shooting, but the conversation—and defendant's focus—quickly

---

[5] During this colloquy, the video depicts Det. Michael demonstrating a buccal swab, *viz.*, motioning in a circular pattern with his hand in the area of his own cheek.

The Superior Court and this Court have been aided by a transcript of the interview. In the Superior Court, the transcript was not admitted as a full exhibit and based upon our comparison of the transcript and the video footage—which contains audio—at times, reasonable minds could differ concerning the precise verbiage used by the detectives and defendant. These slight discrepancies, if any, do not affect the overall totality-of-the-circumstances analysis. We adopt the language used in the transcript.

returned to the consent form. In a second instance evidencing voluntary consent,

defendant read the consent form and signed it:

> "I, Isaiah Pinkerton, having been informed of my right not to have a search made of my persons without a search warrant and of my right to refuse to consent to such a search, do authorize: Detectives of the Providence Police Department to conduct a buccal swab.[6] I give my consent to this search knowing that if any incriminating evidence is found it can be used against me in [c]ourt.
>
> "I give this written permission to the Detectives named above voluntarily and without threats or promises of any kind."

Approximately ten minutes later, two officers, neither of whom previously

participated in defendant's interview, entered the conference room to perform the

buccal swab. In a third instance evidencing voluntary consent, the following ensued:

> "[OFFICER]: What -- what's your name first?
>
> "[DEFENDANT]: Me, Isaiah Pinkerton.
>
> "* * *
>
> "[OFFICER]: Yeah, all right. You're gonna swab, buccal swab?
>
> "[DEFENDANT]: Um, yeah, I guess.
>
> "[OFFICER]: Okay.
>
> "[DEFENDANT]: A buccal swab?

---

[6] The trial justice noted that during the suppression hearing, Det. Michael acknowledged that he had not orally advised defendant of the opportunity to refuse the buccal swab.

"[OFFICER]:  Yeah.

"[DEFENDANT]:  Where's that at?  In my mouth?

"[OFFICER]:  Yeah.

"* * *

"[OFFICER 2]:  Did the other detective explain it to you?

"[DEFENDANT]:  *Yeah, I was just -- just, like, f\* \* \* it. Come on.*

"[OFFICER]:  *Yeah?*

"[DEFENDANT]:  *Yeah.*" (Emphases added.)

The defendant's third expression of consent within an approximately twelve-minute timespan unequivocally and unconditionally demonstrated voluntary consent and contradicts any suggestion that defendant's will was overborne.

Despite the foregoing, defendant insists that his release was predicated upon consenting to the buccal swab and that his various expressions of consent, *see supra*, were the product of Det. Michael's coercive statements.  Applying the totality-of-the-circumstances analysis, however, we conclude that there is simply no evidence in the record to support the argument that Pinkerton's will was overborne. In this regard, we note that defendant had already consented to the buccal swab *before* Det. Michael mentioned seeking his release and *before* Det. Michael responded affirmatively to defendant's inquiry, "So we all gotta do this?"  While

- 28 -

defendant contends on appeal that he interpreted Det. Michael's statements as meaning "he had to submit to the swab," critically, defendant declined to testify at the suppression hearing. In the absence of defendant's testimony or other evidence, defendant asks this Court to speculate, draw its own conclusion, and determine that his will was overborne when he consented to the buccal swab. The trial justice made no such finding and our *de novo* review of the record can discern no constitutional error.

At bottom, "the operative inquiry is whether the evidence presented at the suppression hearing fairly supports the court's finding with respect to voluntary consent." *Gonzalez*, 136 A.3d at 1148 (brackets omitted) (quoting *State v. Barkmeyer*, 949 A.2d 984, 995 (R.I. 2008)). We accord deference to the trial justice's findings of fact and discern no evidence whatsoever that the defendant's will was overborne when he consented to the buccal swab. In so doing, we once again reference the video footage of the detectives' interview with the defendant and recall the familiar adage that "a picture is worth a thousand words * * *." *McElroy v. Stephens*, 331 A.3d 971, 975 n.2 (R.I. 2025). The relatively relaxed nature of the defendant's encounter with the detectives when he thrice consented to the buccal swab, as shown in the video, validates the continued application of this proverb to the law enforcement context and conclusively demonstrates that the defendant's will was not overborne.

**Conclusion**

For the reasons set forth, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

Justice Goldberg participated in the decision and authored the majority opinion but retired prior to its publication.

**Justice Robinson, concurring in part and dissenting in part.** I respectfully but unequivocally dissent. I hasten to add, however, that I dissent only from the majority's ruling concerning the buccal swab issue. I agree with and concur in the Court's opinion upholding the trial justice's denial of the motion to suppress certain cell phone records.

To my mind, the crucial and dispositive point with respect to the buccal swab issue is that, while Mr. Pinkerton was in the process of deciding whether or not he should sign the consent form[1] relative to the buccal swab, he specifically asked Det.

---

[1] It is well established that consent is one of the recognized exceptions to the warrant requirement. *See State v. Gonzalez*, 136 A.3d 1131, 1147 (R.I. 2016). However, it is also well established that consent must be "freely and voluntarily given" in order to constitute a basis for a warrantless search. *Id.* (quoting *State v. Bailey*, 417 A.2d 915, 918 (R.I. 1980)); *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *see also Gonzalez*, 136 A.3d at 1147 ("In the Fourth Amendment context, the state must prove by a fair preponderance of the evidence that there was free and voluntary consent.") (internal quotation marks omitted).

Michael: "*So we all gotta do this?*" (Emphasis added.) Detective Michael's immediate and unqualified answer to that question was: "*Yeah. The other guys are gonna do it too.*" (Emphasis added.)

I am convinced that, in light of Det. Michael's unambiguous but completely false response to Mr. Pinkerton's legitimate question as to whether or not he was required to submit to a buccal swab, the trial justice committed reversible error in failing to grant the motion to suppress the evidence obtained as a result of that buccal swab.

In my judgment, the detective's unequivocal and never altered false response to Mr. Pinkerton's important question, should *in and of itself*, require suppression of the buccal swab evidence. However, when one considers that false response against the background of the totality of the circumstances[2] surrounding Mr. Pinkerton's eventual signing of the consent form, it becomes even more evident that Mr. Pinkerton's purported consent was not "free and voluntary." *See State v. Gonzalez*, 136 A.3d 1131, 1147 (R.I. 2016).

In view of the fact that the false information provided to Mr. Pinkerton by the detective directly related to Mr. Pinkerton's Fourth Amendment rights, I am unable

---

[2]    *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) (stating that whether a consent to a search was voluntary "is a question of fact to be determined from the totality of all of the circumstances"); *Palmigiano v. Mullen*, 119 R.I. 363, 370, 377 A.2d 242, 246 (1977).

to say that it constituted harmless error beyond a reasonable doubt. This Court has recognized harmless error as being "an error that in the setting of a particular case is so unimportant and insignificant that it may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *State v. Terzian*, 162 A.3d 1230, 1244 (R.I. 2017) (internal quotation marks and brackets omitted); *see Chapman v. California*, 386 U.S. 18, 22 (1967); *see also Gonzalez*, 136 A.3d at 1158 ("No court can scrutinize the minds of jurors so as to be able to know with certainty what did or did not influence a particular verdict. But the Supreme Court has told us that the state must 'prove, *beyond a reasonable doubt*, that the error complained of * * * did not contribute to the verdict obtained.'") (emphasis in original) (brackets omitted) (quoting *Chapman*, 386 U.S. at 24); *see also State v. Lopez*, 943 A.2d 1035, 1043 (R.I. 2008) ("[W]hether or not an error is harmless turns on whether it is reasonably possible that the error contributed to the conviction.").

In conclusion, I concur in the Court's opinion concerning the denial of the motion to suppress certain cell phone records. However, I vigorously dissent from the Court's opinion with respect to the buccal swab issue. It is my view that the trial justice erred in not suppressing the evidence obtained from the buccal swab, and I believe that that error was sufficiently grave and pervasive to require the grant of a new trial.

**Justice Long, dissenting.**  I respectfully dissent from the decision affirming the defendant's conviction.  I believe that the trial justice erred in denying Mr. Pinkerton's motion to suppress the cell phone records, as well as his motion to suppress the buccal swab.

## The Motion to Suppress Cell Phone Records

I cannot join in the majority's holding that probable cause existed to issue a warrant for the cellular records for (401) 771-7836 (the 7836 number).  Based on my review of the totality of the circumstances, the affidavit submitted by Detective Theodore Michael lacked any evidence that connected Mr. Pinkerton to this cell phone number or that linked the number to the commission of the shooting of Ms. Brophy-Baermann.  As such, I believe the trial justice erred in declining to grant Mr. Pinkerton's motion to suppress the cell phone records.

We have said time and again that "[t]he Fourth Amendment to the United States Constitution and article 1, section 6, of the Rhode Island Constitution, prohibit the issuance of a search warrant absent a showing of probable cause." *State v. Verrecchia*, 880 A.2d 89, 94 (R.I. 2005).  The search warrant requirement stems from our recognition of "an individual's right to be free from unreasonable search and seizure of their person, home, and possessions." *State v. Hudgen*, 272 A.3d 1069, 1079 (R.I. 2022).  We therefore "generally prohibit[] police officers from conducting searches and seizures without a warrant issued by a neutral, detached judicial

- 33 -

officer." *Id.* at 1080. As part of the warrant application, the state and federal constitutions require a sworn affidavit from a police officer to aid the judicial officer in making a determination as to whether probable cause exists. *See State v. Byrne*, 972 A.2d 633, 637 (R.I. 2009). "Probable cause must be ascertained within the four corners of the affidavit prepared in support of the warrant * * * and based on the totality of the circumstances presented in the affidavit." *Id.* at 638.

The judicial officer's task in evaluating if the affidavit establishes probable cause is to weigh whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). They may "draw reasonable inferences from the affidavit presented to [them]" as part of that determination. *Verrecchia*, 880 A.2d at 94. The trial justice and this Court must give "deference to the issuing magistrate's determination of probable cause and confine ourselves to reviewing whether the magistrate had a substantial basis for [their] finding * * *." *State v. King*, 693 A.2d 658, 661 (R.I. 1997); *see Verrecchia*, 880 A.2d at 95. Because we encourage searches to be conducted pursuant to a warrant, "affidavits are to be interpreted in a realistic fashion that is consistent with common sense, and not subject to rigorous and hypertechnical scrutiny." *Byrne*, 972 A.2d at 638. This Court, however, "examine[s] the record *de novo* to determine independently whether the defendant's constitutional rights have been violated." *Hudgen*, 272 A.3d at 1079.

I believe the issuing judge's conclusion that there was probable cause to grant the warrant application was error. There were no reasonable inferences to draw from the four corners of the affidavit because there were simply no facts that suggested that evidence of the crime would be found in the cell phone records associated with the 7836 number. I believe, therefore, that the judge did not have a substantial basis for her finding.

Detective Michael's warrant application for the cell phone records for the 7836 number included an eight-page affidavit, which contained detailed information about his experience in cellular forensics and about his investigation to that point in time. He described the August 1, 2021 shooting and the Providence police's review of video surveillance footage. He explained that he obtained a search warrant for tower dumps from the major cellular carriers to determine all of the phone numbers in the vicinity of the shooting around the time it occurred. He recounted the December 2021 traffic stop of Mr. Pinkerton, Mr. Mann, and Mr. Laurie; the recovery by police officers of the satchel containing the ghost gun; and the police interviews with these men, in which they told police their phone numbers. He further relayed his comparison of the numbers provided by these men with the tower dump and his identification of social media profiles connected to these numbers; he noted that a number given by Mr. Mann appeared in the tower dump but did not say whether the numbers given by Mr. Pinkerton also appeared. He explained that the

DNA profile collected from the gun was consistent with Mr. Pinkerton's reference profile and noted his subsequent arrest. Detective Michael then stated, "[t]hrough the investigation it was learned that Isaiah Pinkerton also utilized the mobile number of 401-771-7836 through the T-Mobile USA Network that was NOT known by the Providence Police initally [*sic*]." The rest of the affidavit described the arrest and search of Mr. Mann's electronic devices before providing a technical explanation of cellular forensics. The affidavit concluded with a request for the cell phone records for the 7836 number for the period from July 1 through December 18, 2021.

Looking to the warrant application and its accompanying affidavit, they contained no facts that linked Mr. Pinkerton to the 7836 number. The first, and only, reference to that number is the conclusory assertion that "[t]hrough the investigation it was learned that Isaiah Pinkerton also utilized the mobile number of 401-771-7836 * * *." This on its own does not comport with constitutional requirements. Indeed, as the United States Supreme Court has explained, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; [their] action cannot be a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239. I struggle to see how this solitary, vague pronouncement that Mr. Pinkerton "utilized" a mobile phone number could fulfill that condition. It fails to satisfy even the evergreen grade school literary requirements of who, what, when, where, and why.

The affidavit's treatment of Mr. Mann's cell phone number provides a useful contrast. Although Mr. Mann's number was not one that Det. Michael sought to search, the affidavit nevertheless tied that number to the crime by describing how the number supplied by Mr. Mann appeared in a tower dump conducted by the Providence police for the area around the shooting on August 1, 2021. Those facts therefore connected (1) Mr. Mann to a phone number and (2) that phone number to the approximate time and location of the murder. Conversely, the affidavit failed to explain why Det. Michael believed that Mr. Pinkerton utilized the 7836 number when this was not one Mr. Pinkerton had provided to police. The affidavit did not suggest that the number was in the vicinity of the shooting during that time, nor did it allege that this number was utilized to communicate about the shooting either before or after it happened. Rather, the only explanation Det. Michael offered was that "[t]hrough the investigation it was learned" that Mr. Pinkerton used the 7836 number. Detective Michael did not supply even a single fact connecting the 7836 number either to Mr. Pinkerton or to the location and time of the crime. *See Byrne*, 972 A.2d at 640.

To be sure, a warrant application's "deficiency in veracity or reliability 'may be compensated for * * * by a strong showing as to the basis of knowledge, or by some other indicia of reliability.'" *King*, 693 A.2d at 661 (brackets omitted) (quoting *Gates*, 462 U.S. at 233). But this affidavit does not supply any facts to demonstrate

the veracity, reliability, basis of knowledge, or any other indicia of reliability upon which the issuing judge could have based a decision.

In asserting that the affidavit supplied a sufficient basis for the issuing judge to grant the warrant application, the state asks us to take Det. Michael at his word that, based on his years of experience as a police officer well-versed in cellular forensics, and because he told us that people use cell phones to commit crimes, there must be a connection between the 7836 number and Mr. Pinkerton. I simply cannot conclude that the information contained in the affidavit established a fair probability that the 7836 number would lead investigators to evidence of the murder.[1]

The state explains in its brief that Det. Michael learned about Mr. Pinkerton's purported connection to the 7836 number when Silkies Paulino (Ms. Paulino), Dante Mann's girlfriend at the time of his death, went to the police and allowed them to do an extraction on her phone; detectives found that she had saved this number under the name "SOS Cap"—a nickname alleged to have been associated with Mr. Pinkerton. This detail was not included within the affidavit and therefore should not factor into our analysis, *Byrne*, 972 A.2d at 638; however, had Det. Michael shared

---

[1] While I agree with the majority's decision not to address the state's arguments on the good-faith exception to the exclusionary rule, I submit that the facts in the record suggest an absence of good faith when, as here, the affidavit was "so lacking in indicia of probable cause [to search the 7836 number] as to render official belief in its existence entirely unreasonable." *United States v. Leon*, 468 U.S. 897, 923 (1984) (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring in part)).

this information in the affidavit, I believe it would have been a helpful *Gates* indicator of reliability. That Det. Michael declined to include these details is therefore perplexing. Absent that information, however, I believe that the issuing judge erred in granting this warrant and that the trial justice erred in declining to grant Mr. Pinkerton's motion to suppress the cell phone records for the 7836 number.

The next question, then, is whether this error was harmless. *See State v. Gomes*, 881 A.2d 97, 105 (R.I. 2005). It is clear to me that it was not. A harmless error is one that "in the setting of a particular case is so unimportant and insignificant that it may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *State v. Lopez*, 943 A.2d 1035, 1043 (R.I. 2008) (brackets omitted) (quoting *Chapman v. California*, 386 U.S. 18, 22 (1967)). "[W]hether or not an error is harmless turns on whether it is reasonably possible that the error contributed to the conviction." *Id.* "When evaluating improperly admitted evidence, this Court reviews the remainder of the evidence introduced to discern whether the error was harmless beyond a reasonable doubt." *State v. Ramirez*, 936 A.2d 1254, 1267 (R.I. 2007).

Through testimony at trial, we know that the cell phone records placed the 7836 number proximate to the scene of the shooting around the time that it occurred. No other data connected Mr. Pinkerton to the scene of the crime. And, although Ms. Paulino testified that Mr. Pinkerton told her about his involvement in the shooting

and about his visit to Dante Mann's grave (which aligned with the location data recovered from the 7836 number), she was not with Mr. Pinkerton that night and therefore had no direct knowledge of where he was. To be sure, counsel for Mr. Pinkerton had the opportunity to cross-examine her; but it is far more difficult to refute cell site location data that placed a phone, allegedly belonging to Mr. Pinkerton, at the scene of the shooting. The state also used the location of the 7836 number as part of its closing argument portraying Mr. Pinkerton as a participant in the shooting: "before and after the murder, [Mr. Pinkerton and Mr. Mann were] together[.] * * * At 3:34 [a.m.], the time of the murder, where are they? They're right in the vicinity of Olney Street." I therefore cannot conclude that the admission of these records was harmless beyond a reasonable doubt because it was not cumulative and was compelling evidence that established a necessary prerequisite for the state to make its case—that Mr. Pinkerton was present at the scene of the crime, close in time to the murder.

Accordingly, I conclude that the trial justice erred in denying Mr. Pinkerton's motion to suppress because the affidavit accompanying the warrant application failed absolutely to tie Mr. Pinkerton to the phone number and the phone number to the crime. The issuing judge thus lacked a sufficient basis from which to conclude that there was probable cause that a search of the records associated with that number would yield evidence of the crime. In light of that error, I believe that Mr.

Pinkerton's conviction should be vacated and that the matter should be remanded for a new trial.

Beyond my concerns for Mr. Pinkerton's rights as protected by the Fourth Amendment and article 1, section 6, I am greatly troubled that the fruits of this warrant revealed the extensive data of a private individual not involved whatsoever in this case. This individual's name was revealed at trial, and their cell site location data, tracking almost three weeks of their detailed geographic movements, was included as a full exhibit introduced by the state at trial. This is deeply disturbing. Based on the information contained within Det. Michael's warrant application, any number could have been swapped out for the 7836 one—including yours or mine. The majority's decision here allows the police and the state to gain access to anyone's data as long as they baldly represent that their investigation supports doing so. Given the "deeply revealing nature of [cell site location information], its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection," I would hope that this Court would take greater care in allowing police to gather such data. *Carpenter v. United States*, 585 U.S. 296, 320 (2018); *see also State v. Sinapi*, 295 A.3d 787, 802-03 (R.I. 2023) (acknowledging the grave privacy concerns associated with cell phone data). That an uninvolved party's data was not only collected as a result of this warrant but also presented at trial should demonstrate the stakes of an improperly substantiated warrant application. This

suggests all the more strongly to me that the granting of the warrant application and the refusal to suppress the cell phone records were error.

## The Motion to Suppress the Buccal Swab

I also disagree with the majority's conclusion that Mr. Pinkerton voluntarily consented to the buccal swab and that his will was not overborne. It is inescapably clear to me that Mr. Pinkerton did not voluntarily consent to the buccal swab. Moreover, I believe the trial justice's failure to address the substance of Det. Michael's false and constitutionally inaccurate statements made during the custodial interrogation and their effect on Mr. Pinkerton's behavior was error. At no point during the interrogation did Det. Michael inform Mr. Pinkerton that he had the right to refuse to sign the consent form, but instead, told him he had to sign the form and submit to the swab. When Mr. Pinkerton tried to clarify whether signing the form was compulsory, Det. Michael falsely and affirmatively suggested that it was. Mr. Pinkerton also appeared to be confused throughout this encounter about the consequences of signing the form and trusted the oral statements made by Det. Michael rather than taking the time to carefully review the form.

Voluntariness "involves a mixed question of fact and law that impacts a constitutional right, and this Court therefore reviews such determinations *de novo*." *State v. Texter*, 923 A.2d 568, 576-77 (R.I. 2007). "Notwithstanding our *de novo* review of the ultimate determination of voluntariness, we give deference to the

findings of historical fact made by a trial justice in the context of making that determination." *Id.* at 577.

A buccal swab is a search, thus falling within the ambit of the Fourth Amendment. *See Maryland v. King*, 569 U.S. 435, 446 (2013). It is undisputed that the Providence police did not have a warrant to collect a buccal swab from Mr. Pinkerton. Thus, in order to accord with constitutional requirements, the state must prove that Mr. Pinkerton freely and voluntarily consented to the buccal swab. *State v. Gonzalez*, 136 A.3d 1131, 1147 (R.I. 2016). Although Mr. Pinkerton signed the consent-to-search form that permitted the state to conduct a buccal swab, the operative question here is whether Mr. Pinkerton signed this form voluntarily.

The trial justice found that "[t]here [was] no evidence that Det. Michael or Det. [Kevin] Costa overbore Pinkerton's will by threats or inappropriate promises to obtain his consent." From my own review of the interrogation video, however, I am led to the opposite conclusion.

In order to understand how I reached this result, a thorough examination of the exchange is necessary. Detective Michael first introduced the notion of a buccal swab by saying "you're gonna take a buccal, right?"; and, seconds later repeated, "I'm gonna have you sign for a buccal swab * * *." Mr. Pinkerton responded with confusion: "Huh?" to Det. Michael's question and then, "What's that?" to his request. Detective Michael explained that it was "[t]o make sure there's no DNA on

that gun" and stated that he would "fill everything out."  Mr. Pinkerton turned his head downward toward the form Det. Michael handed to him and began to read; he was interrupted roughly seven seconds later by further questioning from both Det. Michael and Det. Costa and lifted his head up to look at them.  After answering their questions, he looked back down at the form and almost immediately expressed confusion again: "[W]ait, what is this right here[?]"  Detective Michael stated, "they're gonna come and get * * * your DNA" and instructed him to sign "[r]ight where the X is."  Mr. Pinkerton then queried: "So we all gotta do this?"  Detective Michael responded, "Yeah. The other guys are gonna do it too."  After Mr. Pinkerton exhibited hesitation, Det. Michael then told him, "I'm gonna try to get you out, man," and it was only at this point that Mr. Pinkerton signed the form.

Based on my analysis of the video and this exchange, I cannot agree with the trial justice's conclusion that Mr. Pinkerton "did not blindly, hastily, or cavalierly sign the consent form."  Observing the direction of Mr. Pinkerton's gaze, he spent fewer than forty seconds looking down at the form.  It is clear to me that he signed the form in response to Det. Michael's false assertions that he was obligated to do so without having been given adequate time to review the consent form[2] or understand the consequences.

---

[2] A review of the consent form reveals that, had Mr. Pinkerton been provided the opportunity to read it more closely, it would have informed him that he had the ability to refuse to consent to the buccal swab.  This fact was clearly lost on him in

More than half a century ago, the United States Supreme Court declared in *Bumper v. North Carolina*, 391 U.S. 543 (1968), that "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, [they have] the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper*, 391 U.S. at 548-49 (footnote omitted). "Besides evidence of police coercion or intimidation, the totality-of-the-circumstances test * * * require[s] consideration of any evidence that law enforcement officers' fraud, deceit, trickery or misrepresentation prompted defendant's acquiescence to the search." *United States v. Vanvliet*, 542 F.3d 259, 264 (1st Cir. 2008). Indeed, "the Fourth Amendment may be violated when consent is obtained through a law enforcement officer's false claim of authority * * *." *Pagán-González v. Moreno*, 919 F.3d 582, 596 (1st Cir. 2019). The majority submits that we cannot know whether Mr. Pinkerton's will was overborne because he did not testify at the suppression hearing. However, it seems clear to me, especially under a totality-of-the-circumstances test, that a detective's affirmative misrepresentations regarding the scope of their

---

light of Det. Michael's affirmative response to his question regarding whether he had to agree to the swab.

authority as to a defendant's constitutional right to refuse consent is impermissible under both the Fourth Amendment and article 1, section 6.[3]

The trial justice and the majority's dogged avoidance in addressing Det. Michael's answers to Mr. Pinkerton's direct questions is curious. Framed generously, Det. Michael's statements misrepresented the bounds of his lawful authority and Mr. Pinkerton's right to refuse consent. More likely, they suggest loose regard for constitutional imperatives by the same detective who vaguely pronounced that Mr. Pinkerton utilized the 7836 number in an attempt to demonstrate probable cause in the previously discussed warrant application. I cannot in good faith agree with the trial justice's conclusion that the state met its burden in proving that Mr. Pinkerton's consent was voluntarily and freely given. I believe that Det. Michael's statements improperly induced Mr. Pinkerton into signing the form at the point in the exchange when he still did not understand the purpose or consequences of the swab. In doing so, Det. Michael vitiated Mr. Pinkerton's ability to freely consent and, accordingly, violated the Fourth Amendment and article 1, section 6. As such, I conclude that the trial justice erred in denying Mr. Pinkerton's motion to suppress the results of the buccal swab.

---

[3] Although this Court has observed that police may lie to a suspect during interrogation about the evidence against them, *see State v. Marini*, 638 A.2d 507, 513 (R.I. 1994), we have certainly never held that police may lie to a suspect about their constitutional rights.

In considering whether this error was harmless, I conclude unequivocally that it was not. *See Gonzalez*, 136 A.3d at 1156. Here, the results from the buccal swab allowed the state to link Mr. Pinkerton directly to the gun and the other items recovered from the satchel found by police on December 12, 2021. The state's evidence tied the cartridge cases left at the scene of the shooting to that gun and allowed them to suggest that it was the one used to shoot Ms. Brophy-Baermann. Without being able to link Mr. Pinkerton to the murder weapon, the state's case would have looked vastly different. Although Ms. Paulino testified that Mr. Pinkerton had confessed to her his involvement in the shooting, nothing else would have tied him directly to its commission, and I cannot conclude definitively that the jury would have credited Ms. Paulino's testimony without this reinforcing evidence. I therefore believe that this error was not harmless beyond a reasonable doubt and that Mr. Pinkerton's conviction must be vacated as a result and the matter be remanded for a new trial.

In no way do I intend to minimize the tragedy of Ms. Brophy-Baermann's death. Every life lost to gun violence is a tragedy. That Ms. Brophy-Baermann had a bright future ahead does not change our obligation to diligently review the defendant's allegations of constitutional error, nor should it move the goalposts for what we find constitutionally impermissible. I believe that Mr. Pinkerton's rights as protected by the Fourth Amendment and article 1, section 6 were violated by both

the search of the cell phone records and the buccal swab.  Because the majority

concludes otherwise, I respectfully dissent.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Isaiah Pinkerton. |
| **Case Number** | No. 2024-104-C.A. (P1/22-3059BG) |
| **Date Opinion Filed** | May 19, 2026 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Brendan P. Sullivan<br>Department of Attorney General<br><br>For Defendant:<br><br>Kara J. Maguire<br>Office of the Public Defender |